1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## EASTERN DISTRICT OF CALIFORNIA

8

9 FRANK W. TRUDEAU,                      1:02-cv-05764-AWI-BAM (HC)

10              Petitioner,              FINDINGS AND RECOMMENDATION
                                         REGARDING PETITION FOR WRIT OF
11     v.                                HABEAS CORPUS

12                                       [Doc. 1]
   D. L. RUNNELS, Warden,
13
              Respondents.
14 _____/

15
16     Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

17 to 28 U.S.C. § 2254.  Petitioner is represented by Carolyn D. Phillips, Esq.

18                         RELEVANT HISTORY

19     Petitioner was convicted in the Fresno County Superior Court of felony possession of

20 methamphetamine (Health & Saf. Code, § 11377, subd. (a)) pursuant to a guilty plea.  After the

21 Court found Petitioner breached the plea agreement, the court sentenced him to 26 years to life in

   prison.
22
       Petitioner appealed his conviction to the California Court of Appeals, Fifth Appellate
23
   District.  On August 23, 1999, the Court of Appeals modified the sentence by striking the one-
24
   year enhancement for the prior prison term but otherwise affirmed the judgment.
25
       The California Supreme Court denied review.
26
       The United States Supreme Court denied the petition for writ of certiorari.
27
       Petitioner thereafter filed three post-conviction collateral petitions in state courts.  The
28

first petition was filed in the Fresno County Superior Court on May 1, 2001.  The petition was

denied on May 7, 2001.  The second petition for writ of habeas corpus was filed the California

Court of Appeal, Fifth Appellate District on June 27, 2001.  The petition was denied on

November 8, 2001.  Petitioner filed the third petition for writ of habeas corpus in the California

Supreme Court on January 2, 2002, which was denied on May 1, 2002.

Petitioner filed the instant federal petition for writ of habeas corpus on June 24, 2002.

After remand from the Ninth Circuit, Respondent filed an answer to the petition on July 27,

2011.  Petitioner filed a traverse on September 23, 2011.

STATEMENT OF FACTS[1]

On February 6, 1995, police were dispatched to a motel in Fresno where
they found [Petitioner] knelling beside a woman who had suffered a drug
overdose.  The officers suspected [Petitioner] was under the influence of a
stimulant.  They arrested him and found numerous bindles of methamphetamine, a
syringe, and a glass vial in his pockets.[FN 1] The officers also found a loaded
gun in the wastebasket.[FN 2]

FN 1. These facts are not in dispute and are summarized from the
Probation Report.

FN 2. The gun was apparently not attributed to [Petitioner].

On March 8, 1995, the district attorney charged [Petitioner] with
possession of methamphetamine (Health & Saf. Code, § 11377, a wobbler offense
[FN 3] and being under the influence of a controlled substance (Health & Saf.
Code, § 11550, subd. (a), a misdemeanor.  The information further alleged that
[Petitioner] had served one prior prison term (Pen. Code, § 667.5, subd. (b)) [FN
4] and had suffered two prior serious felony convictions within the meaning of
California's Three Strikes law (§§ 667, subds. (b)-(i)) and 1170.12).

On March 14, 1995, [Petitioner] pled not guilty to the charges and denied
the prior conviction and prison term allegations.

On October 13, 1995, [Petitioner] agreed to a "straight up" plea bargain.
In exchange for [Petitioner's] pleading guilty and admitting the prior conviction
and prison term allegations, the court postponed sentencing for two years (with a
status hearing after one year) and promised to reduce the possession wobbler
charge to a misdemeanor pursuant to section 17, subdivision (b) (hereafter section
17(b)) if [Petitioner] avoided arrest during those two years.  The court warned
[Petitioner] that an arrest during that period would result in imposition of a 25-
year-to-life sentence.

"[THE COURT]: . . . And in that period of time if you have not
been arrested on the day of sentencing in two years the Court will entertain and

_____

[1] This statement of facts is taken from the California Court of Appeals August 23, 1999 decision.

grant a 17(b) motion to make Count One a misdemeanor. On the other hand, if you have in the next two years–[sic] any time during the next two years if you have been arrested we will immediately have a hearing with regard to that arrest and the hearing will be very similar to a probation violation hearing. And if the Court determines that you have indeed violated the law, that being that for which you were arrested, then at that point the extension for the sentencing will terminate and the sentencing will be that day, and the sentence will be as a matter of law twenty-five years to life."

FN 3. A crime which is punishable by either imprisonment in state prison (as a felony) or county jail (as a misdemeanor) is called a "wobbler." Possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)) is a wobbler offense. Penal Code section 17, subdivision (h) permits the trial court to exercise its discretion in reducing a wobbler to a misdemeanor. (People v. Banks (1959) 53 Cal.2d 370, 380-381.)

FN 4. All subsequent statutory references are to the Penal Code unless otherwise noted.

Again, the court repeated the bargain:

"THE COURT: You understand the risk that you're taking that if you are arrested and we have a hearing similar to a probation violation hearing with the same standard that the Court has that at that point you won't have a jury trial, you will have a hearing before me to determine whether or not you have indeed committed a violation of the law, and if the Court finds that you have I will at that point sentence you to twenty-five years to life?"

"[PETITIONER]: Yes, sir, I do understand."

The court also informed [Petitioner] that, if the court reduced his wobbler offense to a misdemeanor at the end of the two-year period, [Petitioner] would still be required to serve a one-year state prison term. The record does not show, however, that the trial court admonished [Petitioner], pursuant to section 1192.5, of his rights to withdraw his guilty plea if the court disapproved the bargain.

One year later, on October 16, 1996, [Petitioner] failed to appear for the status hearing. The court issued alternative orders: (1) if [Petitioner] had committed no new offenses, the matter was set for October 16, 1997, or (2) if [Petitioner] had committed a new offense, the court accepted the plea and set the matter for judgment and sentencing on November 14, 1996. The court said it would choose the second alternative if [Petitioner] could not present an adequate reason for his absence.

Three hours later, the court reconvened and was told by defense counsel that [Petitioner] had called, stating he had an emergency and would be in court at 2 p.m. After 2 p.m., the court reconvened again. [Petitioner] was still absent and had not spoken to defense counsel. The court invoked its previously stated second alternative and told defense counsel that [Petitioner] was required to report to the probation department within two days.

On November 14, 1996, [Petitioner] failed to appear for sentencing. Defense counsel explained that [Petitioner] had called on October 25 and also prior to that time but while counsel was in court. [Petitioner] told defense counsel he had missed his court date on October 16, 1996, because he was at the hospital

for a medical emergency.  Defense counsel told [Petitioner] he needed to go to probation even though he was late.  The two planned to meet the following week to discuss the case, but [Petitioner] never contacted defense counsel.

The court issued a no-bail bench warrant for [Petitioner's] arrest and then sentenced him in absentia to 25 years to life, plus a one-year enhancement for the prior prison term and a $5,000 restitution fine.

On April 2, 1997, [Petitioner] finally appeared.  The court was informed that [Petitioner] had been in custody on November 14, 1996, when he was sentenced in absentia.  Regarding the October 16, 1996, absence, [Petitioner] explained he was living in Sacramento at that time.  He had come to Fresno for his court date, but was unable to appear because he accompanied his pregnant wife to the hospital when she suffered emergency medical problems.  He said that he needed to get back to Sacramento because he had not been able to reach his parole officer before he left and the officer wanted him back in Sacramento.  He claimed that, on October 17, 1996, the day after his missed court date, he spoke to defense counsel who told him that he should return to Fresno as soon as possible, that they would get a court date, and that they would "handle" the situation.  [Petitioner] explained that when he returned to Sacramento, his parole officer decided he had violated parole for traveling to Fresno without a travel pass.  [Petitioner] explained he had been unable to contact his parole officer to get the travel pass before he left for Fresno. [Petitioner] stated he was taken into custody on October 21, 1996, for parole violations and therefore could not return to Fresno as he had intended.  He explained that he and his family now lived in Fresno and that he was promised a job with his wife's uncle.

The trial court told [Petitioner] to obtain documentation both from his parole officer regarding his violation and custody dates and from the hospital regarding his wife's medical emergency and dates of admittance and discharge.  The court stated:

"THE COURT: If you bring that documentation and I'm satisfied that what you're telling me now is absolutely true and correct, then we'll take a second look at this.  But if it's not, I'm telling you now, there's nothing more to talk about."

One week later, on April 16, 1997, the court reconvened to examine the parole officer's report.  The court said the report stated that [Petitioner] had been arrested on October 23, rather than on October 21 as [Petitioner] had claimed.  Furthermore, the report showed there were many reasons why [Petitioner] was arrested.  Based on the report, it appeared to the court that [Petitioner] had breached the plea bargain of October 13, 1995.  The court vacated its earlier sentence (imposed in absentia) and reset sentencing for May 14 ,1997.

At the sentencing hearing on June 3, 1997, [Petitioner] presented the court an admission slip from Kaiser Permanente Hospital.  The following discussion ensued regarding the authenticity of the slip's information:

"THE COURT: What's the date on the admission slip?

"[THE PROSECUTOR]: Your Honor, I think the Court should look at it.

"[DEFENSE COUNSEL]: Can I approach, Your Honor?

4

1      "THE COURT: Please.

2      "[THE PROSECUTOR]: I want the Court to note what appears to be
possibly [sic] erasures and the typing of the date seems quite amateurish with a
3      capital "I" have [sic] been used as a 'one.'  This document was not produced a
long time ago when Defense was given an opportunity to produce proof of being
4      admitted at [Kaiser Permanente Hospital].

5      "THE COURT: It is rather peculiar that on a carbon copy where
everything else is carbon that we now have new typing.
6
       "[DEFENSE COUNSEL]: I understand.
7
       "THE COURT: Okay.
8
       "[DEFENSE COUNSEL]: I don't know, it was just handed to me this
9      morning, Your Honor."

10     The court proceeded to make the following findings: [Petitioner's] absence
on October 16 was not excused, he was arrested on October 23, 1996, for a parole
11     violation, he "admitted ingesting methamphetamine a week earlier," he had
"access to the illegal weapon," he was "out of contact" with his parole officer, and
12     he was "legitimately arrested."

13     Although never mentioned by the court, the May 29, 1997, Probation
Officer's Report showed [Petitioner] also had been arrested on May 23, 1996, for
14     driving with a suspended license.  (Veh. Code, § 14601.1, a misdemeanor.)  And
in the report's narrative conclusion, the probation officer stated, "The defendant's
15     history shows a poor performance while on parole as well as picking up a
misdemeanor charge of Driving on a Suspended License."
16
       After reviewing the October 23, 1996, Parole Officer's Report and the
17     May 29, 1997, Probation Officer's Report and considering [Petitioner's]
statements and evidence (the hospital admission slip), the court determined the
18     plea bargain had been breached and sentenced [Petitioner] to 25 years to life for
the felony methamphetamine conviction, plus an additional year for the prior
19     prison term (§ 667.5, subd. (b)).

20     [Petitioner] filed a timely notice of appeal on July 18, 1997.  On July 21,
1997, [Petitioner] filed a second notice of appeal and a request for a Certificate of
21     Probable Cause, which the trial court denied the same day.  On March 18, 1998,
this court directed the trial court to issue a Certificate of Probable Cause.  The trial
22     court did so on August 4, 1998.

23     (LD[2] 1 at 2-8.)

24                           DISCUSSION

25  A.   Jurisdiction

26     Relief by way of a petition for writ of habeas corpus extends to a person in custody

27  ─────────────────

28     [2] LD refers to the Lodged Documents as referenced in the Notice of Lodging Records filed by Respondent
on July 27, 2011.

5

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>,

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.

28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; <u>Jeffries v. Wood</u>, 114

F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

<u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

1114 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    <u>Standard of Review</u>

The instant petition is reviewed under the provisions of the Antiterrorism and Effective

Death Penalty Act which became effective on April 24, 1996.  <u>Lockyer v. Andrade</u>,  538 U.S. 63,

70 (2003).  Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Harrington v. Richter</u>, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

(2011); <u>Lockyer</u>, 538 U.S. at 70-71; <u>Williams</u>, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71,

*quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id.  If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. Id.  If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

III.   Review of Petition

Petitioner has raised ten claims for habeas corpus relief.  Each claim will be considered separately.

A.    Sentence In Violation of Plea Agreement

Petitioner contends his sentence violates past plea agreements.  It appears Petitioner is arguing that his past plea agreements did not anticipate the level for which those convictions would be used in the future to enhance his sentence.

The Supreme Court has recognized:

> When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  He may only attack the voluntary and intelligent character of the guilty plea by showing that the advise he received from counsel was not within the standards set forth in McMann.

Tollett v. Henderson, 411 U.S. 258, 267 (1973).  Further,

> A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence.  Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceedings, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary.  If the answer is in the affirmative, then the conviction and the plea, as a general rule, foreclose the collateral attack.

United States v. Broce, 488 U.S. 563, 569 (1989) (guilty pleas foreclosed double jeopardy challenge to convictions).

The instant claim is foreclosed by the Supreme Court's reasoning in Tollett and Broce. More specifically, at the time Petitioner pled guilty to the current offenses, he was well aware what his sentence would be and how it would be constructed.  (CT 78-87.)  Therefore, this claim is foreclosed from review.  Moreover, the Supreme Court has determined that the use of a prior conviction to enhance a sentence in a future case does not alter the terms of the prior plea agreement but rather imposes a stiffer sentence for the present conviction.  Monge v. California, 524 U.S. 721, 728 (1998).

B.    Sentence Exceeded The Jurisdiction Of The Sentencing Court

Petitioner argues that his sentence exceeded the jurisdiction of the sentencing court in violation of California law.  This claim is foreclosed by Tollett and Broce because Petitioner received the sentence bargained for in the plea agreement.  In addition, Petitioner fails to allege a violation of federal law and his claim is barred from review in this Court.  Mere reference to due

process is not sufficient to allege a constitutional violation.  Indeed, in the relief portion of this claim, Petitioner asks this Court to disagree with the state court's denial of this claim which found the sentencing court was empowered by California law to impose the 25 year to life sentence.

       C.    <u>Sentencing Court Violated Plea Agreement</u>

       Petitioner contends the sentencing court violated his plea agreement by imposing a one-year enhancement in addition to the twenty-five years to life sentence.  This claim was substantiated on direct appeal by the state appellate court and the one-year enhancement was stricken.  (Lod. Doc. 1 at 20, 34.)  Petitioner continues to argue that he should have been given the opportunity to withdraw his plea.  However, the state court determined the proper remedy was to correct the sentence.

       When a plea agreement rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled.  <u>Santobello v. New York</u>, 404 U.S. 257, 22 (1971).  The determination of the appropriate relief for a violation is for the State to determine.

> The ultimate relief to which petitioner is entitled we leave to the discretion of the state court, which is in a better position to decide whether the circumstances of this case require only that there be specific performance of the agreement on the plea, in which case petitioner should be resentenced by a different judge, or whether, in view of the state court, the circumstances require granting relief sought by petitioner, i.e., the opportunity to withdraw his plea of guilty.

<u>Santobello</u>, 404 U.S. at 263 (footnote omitted); <u>see</u> <u>Pierre v. Thompson</u>, 666 F.2d 424, 427 (9th Cir. 1982) (district court properly determined that it was within the state court's discretion to determine the remedy for a broken plea agreement); cf. <u>United States v. Anderson</u>, 970 F.2d 602, 608 (9th Cir. 1992) ("It is for the district court to decide what remedy is appropriate, including its discretion whether to grant Anderson the option of withdrawing his plea and repleading or proceeding to trial.[]").

       In this case, the state appellate court reasonably determined that the proper remedy was to correct the sentence and strike the one-year enhancement.  In this instance, Petitioner received the benefit of the plea bargain of 25 years to life-the bargained for sentence.  Indeed, the state

appellate court stated:

> [S]pecific performance provides [Petitioner] the benefit of his bargain, which is not extraordinarily lenient, while preserving the valuable policy benefits of plea bargains in general.  'Negotiated pleas facilitate the efficient disposition of causes and allow victims to avoid the trauma and inconvenience of trial.  Allowing a defendant to withdraw a guilty plea will often run counter to the interest of crime victims.' [Citation.]

(LD 1 at 20.)  The state court's determination was not objectively unreasonable under clearly established Supreme Court precedent. 28 U.S.C. § 2254.

### D.   Violation Of Right To Jury Trial On Three Strikes Sentence

Petitioner claims that he pled guilty because his option for a jury trial did not include a determination by the jury as to whether the Three Strikes law applied to his sentence.

There is no right to a jury trial on the determination of whether a defendant has suffered a prior conviction to qualify for sentencing under the Three Strikes law.  Petitioner specifically acknowledged and waived his right to a jury trial on the prior convictions.   Accordingly, Petitioner's claim is without merit.

### E.   Failure Of Trial Court To Exercise Discretion And Strike Prior Conviction

Petitioner contends the trial court abused its discretion by failing to strike a prior conviction.  As an initial matter, this claim is barred by the principle set forth in Tollett and Broce.  In addition, the claim involves a matter of California law only which is not subject to review under section 2254.  Furthermore, the state appellate court reasonably rejected Petitioner's claim under controlling California law stating:

> [Petitioner] next takes the position the trial court abused its discretion by failing to reduce his wobbler possession offense to a misdemeanor (§ 17(b); *Alvarez*, *supra*, 14 Cal.4th 968) and to strike one or both of his prior conviction allegations (§ 1385, subd. (a); *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497).  Since these determinations are similar considerations (*People v. Bishop* (1997) 56 Cal.App.4th 1245, 1249-1250), we will review them together.
>
> We first dispose of [Petitioner's] suggestion that the trial court did not recognize its discretion under either section 17(b) or section 1385, but instead felt compelled, upon [Petitioner's] purported violation of the plea bargain, to invoke its sentence. [Petitioner] asserts that the California Supreme Court's positions on these two issues of discretion were not decided at the time of his *plea bargain* on October 13, 1995.  This assertion is correct but irrelevant.  At the time of [Petitioner's] *sentencing* on June 3, 1997 (when the trial court acquired discretion to reduce the wobbler and still possessed discretion to strike the priors), both

*Alvarez* (January 1, 1997) and *Romero* (June 20, 1996) had been issued by the Supreme Court.  Thus we presume the trial court was aware of its discretion and [Petitioner] provides no evidence to indicate otherwise.  (*People v. Fuhrman* (1997) 16 Cal.4th 930, 945.)

(LD 1 at 22-23) (emphasis in original).

This Court is bound by the state court determination and federal habeas relief is not available to retry state issues.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Milton v. Wainwright, 407 U.S. 371, 377 (1972); see also Miller v. Vasquez, 868 F.2d 1116, 1118-1119 (9th Cir. 1989) (holding claim that prior conviction was not "serious felony" under California's sentencing law not cognizable in federal habeas proceeding).

### F.     Sentence In Violation Of Separation Of Powers

Petitioner contends in conclusory terms that his sentence violated the separation of powers principles in that it prevented the judge from exercising his discretion.  As previously stated, because Petitioner pled guilty to the bargained-for sentence of 25 years to life, his current challenge is foreclosed by the holdings in Tollett and Broce.  In any event, the current claim is nonsensical.  As Petitioner acknowledges in his previous claim, the Three Strikes law does not by statute eliminate judicial discretion in striking a prior conviction.  Accordingly, Petitioner's claim is both foreclosed from review in this Court and is without merit.

### G.     Three Strikes Sentence Violation Of Ex Post Facto Clause

Petitioner argues the Three Strikes law as applied to him violated the Ex Post Facto Clause.

The Ex Post Facto Clause prohibits a state from enacting a law that imposes additional punishment for a crime than the punishment was when the defendant committed the crime. Weaver v. Graham, 450 U.S. 24, 28, 101 S.Ct. 960, 964 (1981).  A law violates the Ex Post Facto Clause under three circumstances:  (1) when it punishes an act which was not a crime when it was committed; (2)  when it makes a crime's punishment greater than when the crime was committed; or (3) when it deprives a person of a defense available at the time the crime was committed.  Collins v. Youngblood, 497 U.S. 37, 42, 110 S.Ct. 2715, 2719 (1990).  A statute enhancing a defendant's sentence because the defendant is a recidivist does not punish the

defendant again for the prior offense.  <u>Wittie v. United States</u>, 515 U.S. 389, 400, 115 S.Ct. 2199,

2206 (1995).  Recidivist statutes have been upheld in the face of ex post facto arguments even if

the convictions used to enhance the sentence occurred before the recidivist statute was enacted.

<u>See</u> <u>United States v. Ahumada-Avalos</u>, 875 F.2d 681, 683-84 (9th Cir. 1989) (*per curiam*).

The state appellate court reasonably determined that there was no ex post facto violation

in this case.  (LD 1 at 32; <u>see</u> <u>also</u> <u>Brown v. Mayle</u>, 283 F.3d 1019, 1040 (9th Cir. 2002)

("Application of a sentencing enhancement due to a prior conviction does not violate the Ex Post

Facto Clause, as long as the statute was in effect before the triggering offense was committed."

(citations omitted)), vacated on other grounds, 538 U.S. 901 (2003).)  Accordingly, there is no

basis for finding the state appellate court's decision was contrary to or an unreasonable

application of clearly established Supreme Court precedent.

H.    <u>Ineffective Assistance Of Trial Counsel For Failure To Investigate Defenses And Plea Agreements At Preliminary Stages Of Proceedings</u>

Petitioner contends that trial counsel was ineffective for failing to investigate defenses

and plea agreements at the preliminary stages of the proceedings.  As with the prior claims, this

claim is foreclosed by <u>Tollett</u> and <u>Broce</u>.  If the basis of an ineffective assistance of counsel claim

does not relate to the voluntary and intelligent nature of the plea, the <u>Tollett</u> and <u>Broce</u> bar on

claims based on pre-plea constitutional violations will apply.  For instance, in <u>Moran v. Godinez</u>,

57 F.3d 690, 699-700 (9th Cir. 1994), the Ninth Circuit found a claim that petitioner's attorney

performed ineffectively by failing to attempt to suppress his confession to be barred by <u>Tollett</u>.

Likewise, here, Petitioner fails to allege or demonstrate how counsel's actions at the preliminary

stages of the proceedings affect his later plea.  Accordingly, Petitioner's claim is without merit.

I.    <u>Ineffective Assistance Of Counsel At Later Proceedings</u>

Petitioner further contends that his counsel in later state court proceedings was

ineffective.  Petitioner raises the following five claims of ineffective assistance of counsel: 1)

failed to file motions for dismissal for violations of prior plea agreements in relation to his prior

convictions; 2) failed to advise him of the triggering aspects of his plea bargain; 3) failed to file a

"Romero" motion prior to sentencing; 4) failed to file a motion to withdraw Petitioner's plea

13

when improper sentence imposed; and 5) failed to investigate Petitioner's claims of defense.

Only two of these claims could arguably challenge the intelligent and voluntary nature of the plea, i.e. failure to be advised of aspects of plea bargain and failure to file a motion to correct the sentence when it was imposed. The other three claims are challenges that occurred prior to the entry of Petitioner's plea.

As just stated, Petitioner contends that counsel failed to fully advise him of the triggering aspects of his plea bargain. Notwithstanding the fact that Petitioner fails to explain what aspects he was not advised of, the state court record clearly refutes his claim. At the change of plea hearing, the trial court thoroughly and clearly explained to Petitioner all pertinent aspects of the plea bargain including, forgoing a trial by jury or court, the right to test the prosecution's burden of establishing guilt beyond a reasonable doubt, the right to confront and cross-examine witnesses, and the right to testify on his own behalf. (CT 83.) The court also explained that Petitioner would face a sentence of twenty-five years to life in state prison if he were arrested and determined to have violated the law, within two years following the hearing. (CT 79-80.) After listening and acknowledging such rights, the trial court read the charges and allegations, and Petitioner pled guilty and admitted each allegation. (CT 84-86.) Petitioner went so far as to inform the court it had "been very clear" and Petitioner acknowledged he had sufficient time to converse with counsel. (CT 82.) Thus, given the lack of indication as to how counsel allegedly did not advise him, and considering the thorough advisements by the trial court in accepting Petitioner's plea, the state court reasonably determined this claim was consistent with Tollett. Moreover, the state appellate court found the trial court did not violate the plea agreement and reasoned as follows:

> Contrary to both the People's position and the trial court's later rendition of the plea bargain, [FN. 7] under which any arrest constituted a breach, we conclude the plea bargain explicitly conditioned [Petitioner's] probation on his avoiding arrest for violation of the *law*. We repeat the pertinent portion of the trial court's statement of the plea bargain on October 13, 1995:

> "[THE COURT]: And if the Court determine that you have indeed *violated the law, that being that for which you were arrested*, then at that point the extension for the sentencing will terminate and the sentencing will be that day, and the sentence will be as a matter of law twenty-five years to life." (Italics added.)

14

[FN. 7] On June 3, 1997, the following colloquy occurred in which the trial court stated a variation on the original plea bargain:

"[Trudeau]: I haven't been charged with no new - -

THE COURT: That wasn't the deal.  That wasn't the agreement.  The agreement was that if you were arrested for anything, and you were, you were arrested for a parole violation.  And you, in fact, were in violation of your parole.  That is an arrest.  That is a breach of the agreement.  (Italics added.)

[Petitioner]: I didn't understand that, what you meant by a criminal - - some kind of criminal thing.

THE COURT: Mr. Trudeau, this was not hard to figure out.

[Petitioner]: This isn't - - this isn't a criminal act though, sir, this is like - - it's like some kind of administrative action, okay.  I - -

THE COURT: All right.  I understand your position."

And again, only moments later, the court reiterated:

"THE COURT: You understand the risk that you're taking that if you are arrested and we have a hearing similar to a probation violation hearing with the same standard that the Court has that at that point you wont' have a jury trial, you will have a hearing before me to determine whether or not you have indeed committed a violation of the law, and if the Court find that you have I will at that point sentence you to twenty-five years to life?"  (Italics added.)

Thus the trial court explicitly told [Petitioner] that upon his arrest the court would determine if he had violated the law.  If the court so found, it would impose the 25-year-to-life sentence according to the terms of the bargain.  The logical corollary of this provision is that if the court found [Petitioner's] arrest was not the result of a violation of the law, it would not impose the 25-year-to-life sentence.  Therefore, the trial court's explanation of the plea bargain reveals that [Petitioner] was subject to a single condition—that he not be arrested for a violation of the law.

### C. *Revocation of [Petitioner's] Probation*

"'"In placing a criminal on probation, an act of clemency and grace [citation], the state takes a risk that the probationer may commit additional antisocial acts.  Where probation fails as a rehabilitative device, as evidenced by the probationer's failure to abide by the probation conditions, the state has a great interest in being able to imprison the probationer without the burden of a new adversary criminal trial. [Citation.]" (*People v. Rodriguez* (1990) 51 Cal.3d 427, 445 . . . .)' ... [Citation.]" (*People v. McGavorck* (1999) 69 Cal.App.4th 332, 337.)

Section 1203.2 allows the trial court to revoke probation if it has reason to believe the probationer has violated any of the probation conditions.  (§ 1203.2, subd. (a).)  The formal rules of evidence do not apply to probation revocation hearings and evidence not admissible at trial may be admissible at a probation revocation hearing.  (*Morrissey v. Brewer* (1972) 408 U.S. 471, 489.)  Furthermore, the facts justifying revocation need be proved only by a preponderance of the evidence.  (*People v. Rodriguez, supra*, 51 Cal.3d at p. 447.)  "'The phrase "preponderance of the evidence" is usually defined in terms of probability of truth, e.g., "such evidence as, when weighted with that opposed to

15

it, has more convincing force and the greater probability of truth." [Citation.]'
[Citation.]" (*People v. Lopez* (1997) 52 Cal.App.4th 233, 250.)  Although other
evidence is admissible, the trial court may, and usually does, rely on the probation
officer's report as the predominant source of evidence supporting revocation.
(See § 1203.2, subd. (a).)

The relaxed rules of evidence in revocation hearings reflect the great
flexibility and broad discretion given to judges in deciding whether to revoke
probation.  (*People v. Rodriguez, supra*, 51 Cal.3d at p.443; § 1203.2, subd. (a).)
For example, evidence that the probationer has committed another crime during
his probation period is admissible at a revocation hearing even if he has been
acquitted of that new charge at trial (*In re Coughlin* (1976) 16 Cal.3d 52, 58)
because "probation may be revoked despite the fact that the evidence of the
probationer's guilt may be insufficient to convict him of the new offense.'
[Citation]" (*People v. Rodriguez, supra*, 51 Cal.3d at p. 442.)

However, "'"while the discretion of the trial court to revoke probation is
said to be 'very broad,' the court may not act arbitrarily or capriciously.  Its
determination must be based on the facts before it.'" [Citations.] A trial court's
discretionary act is accorded great weight on appeal: It 'will not be disturbed
unless it is abused, i.e., the appellate court will not substitute its own view as the
proper decision.' [Citation.] To warrant reversal the record must suggest "'a
manifest miscarriage of justice.'" [Citation.]" (*People v. Angus* (1980) 114
Cal.App.3d 973, 987-988.)

In the present case, the trial court was authorized to revoke [Petitioner's]
probation only if it found by a preponderance of the evidence that [Petitioner] had
been arrested for violating the law.  At the sentencing hearing on June 3, 1997, the
trial court stated its findings:

>          "THE COURT: . . . The court has received and
> reviewed the nine-page probation report of May 29 and the three-
> page statement of the Defendant.
>          "Also, of course, I have the October 23rd, 1996,
> parole report, which I'm making part of the record.
>          "On October 13, 1995, the Defendant pled guilty to
> Counts One and Two and admitted the strikes.
>          "On October 16 there was a failure to appear here,
> which the Court does not find excused.
>          On October 23rd, 1996, he was arrested by parole
> and the parole report speaks for itself.
>          "The Defendant admitted ingesting
> methamphetamine a week earlier.
>          "He was - - he did have access to the illegal
> weapon.
>          "He was out of contact.
>          "He was legitimately arrested.
>          "And that, according to the change of plea transcript
> of October 13, 1995, specifically at page two, that is a breach of
> the agreement."

Thus, in addition to parole violations, the trial court specifically found two
violations of law.  First, the court found [Petitioner] had ingested
methamphetamine, a violation of section 11550, subdivision (a).  This finding is
supported by the May 29, 1997, probation officer's report which states the

defendant: "admitted that he was continuing to use crank, and admitted to your officer that he was also involved in the making of crank. The defendant admits that he would stay up for as long as 44 days at a time and went through a 'meth coma' of five days. The defendant feels that he needs a lot of help for his methamphetamine usage. . . . [¶] . . . The defendant continues to use methamphetamine before and after the instant crime.

In response to this evidence, [Petitioner] said only, "Use of meth means, I had a doctor's prescription for my sinuses." He did not, however, explain which prescription drug he had taken nor did he present the doctor's prescription or any other documentary evidence in support of his claim that his drug use was medically sanctioned. The trial court therefore had reason to believe the probation officer's statement had "more convincing force and the greater probability of truth" (*People v. Lopez*, *supra*, 52 Cal.App.4th at p. 250) than [Petitioner's] unsupported claim. Consequently the court had reason to believe [Petitioner's] use of methamphetamine was in violation of the law.

Second, the trial court also specifically found that [Petitioner's] failure to appear as required on October 16, 1996, was unexcused. (§ 1320.) [Petitioner] repeatedly justified his absence by explaining he had assisted his pregnant wife through a medical emergency after they arrived in Fresno on October 15. He explained his wife was not released from the hospital until the afternoon of October 16. He said he then spoke to defense counsel who told him he could go home to Sacramento until their next court date.

The trial court gave [Petitioner] the opportunity to present evidence in support of his purported excuses. [Petitioner] offered his own statement and the hospital slip, which the court apparently found unreliable. Again, we defer to the trial court's implied finding that the preponderance of the evidence showed [Petitioner's] failure to appear on October 16, 1996, was unexcused. [Petitioner] did not offer adequate evidence to convince the trial court otherwise. [FN. 8]

[FN. 8] [Petitioner's] failure to appear on November 14, 1996 was apparently excused by evidence that he was in custody in Sacramento at that time.

In sum, we conclude the trial court had reason to believe [Petitioner] had been arrested for violating the law. Assuming the trial court misstated the condition of [Petitioner's] probation, the error was harmless because the court's findings also satisfied the actual condition. The trial court did not abuse its discretion in revoking [Petitioner's] probation and imposing the bargained-for 25-years-to-life sentence. [FN. 9]

[FN. 9] We note that the trial court had before it evidence of [Petitioner's] arrest for a third violation of the law to which did not specifically refer on the record. The probation officer's report shows that, on May 23, 1996, [Petitioner] was arrested for driving with a suspended license. (Veh. Code, § 14601.1.) He served jail time and paid a fine. At the sentencing hearing, the trial court did not mention this arrest–perhaps because it erroneously believed the plea bargain could be breached by any arrest or because it had already specifically found other arrests for violations of the law.

(LD 1 at 10-15.)

The state appellate court's determination was not objectively unreasonable. The trial

court clearly advised Petitioner that a new arrest would result in a hearing similar to a parole

revocation hearing, i.e. application of a preponderance of the evidence standard, not beyond a

reasonable doubt.  Based on the evidence that was before the trial court, it was reasonable to find

by a preponderance of the evidence that Petitioner committed a new violation by, his own

admission, of using methamphetamine.

Petitioner also claims counsel failed to file a motion to correct his sentence when it was

imposed.  As explained *supra*, Petitioner's sentence was constitutional, with the exception of the

one-year enhancement struck by the appellate court.  Thus, even if it is assumed counsel was

somehow deficient, Petitioner has not and cannot demonstrate prejudice as the only erroneous

portion of the sentence was stricken.

J.    Sentence Of Twenty-Five Years To Life Cruel And Unusual Punishment

Petitioner argues his sentence of 25 years to life constituted cruel and unusual

punishment.    In denying this claim on direct appeal, the state appellate court analyzed both the

applicable state and federal law, and held the claim failed under both standards.  With relation to

the federal law, the appellate court stated:

> [Petitioner] also contends his sentence violates the Eighth Amendment's
> prohibition against cruel and unusual punishment because it is "significantly
> disproportionate" to the "relatively minor" crime for which it was imposed.
>
> The United States Supreme Court has noted that "[o]utside the context of
> capital punishment, successful challenges to the proportionality of particular
> sentences have been exceedingly rare." (*Rummel v. Estelle*, *supra*, 445 U.S. at p.
> 272.)  In *Rummel*, the defendant received a mandatory life sentence after a felony
> conviction for obtaining $120.75 by false pretenses.  He previously had been
> convicted of fraudulent use of a credit card to obtain $80 worth of goods or
> services and passing a forged check in the amount of $28.36, both felonies.
> Holding that the sentence did not constitute cruel and unusual punishment under
> the federal Constitution, the court explained:
>
> > "The purpose of recidivist statute such as that involved here
> > is not to simplify the task of prosecutors, judges, or juries.  Its
> > primary goals are to deter repeat offenders and, at some point in the
> > life of one who repeatedly commits criminal offenses serious
> > enough to be punished as felonies, to segregate that person from
> > the rest of society for an extended period of time.  This segregation
> > and its duration are based not merely on that person's most recent
> > offense but also on the propensities he has demonstrated over a
> > period of time during which he has been convicted and sentenced
> > for other crimes.  Like the line dividing felony theft from petty
> > larceny, the point at which a recidivist will be deemed to have

1

2

demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction."   (*Rummel v. Estelle*, *supra*, 445 U.S. at pp. 284-285.)

3

4

5

[Petitioner] cites *Solem v. Helm* (1983) 463 U.S. 277, at pages 290-300 as authority.  In *People v. Cooper*, *supra*, 43 Cal.App.4th at pages 820, 824, we exhaustively addressed the holding of Solem, its effect after *Harmelin v. Michigan*, *supra*, 501 U.S. 957, and the application of both cases to Three Strikes defendants.  We reach the same conclusion here as we did in *Cooper*:

6

7

8

9

10

"Comparing *Harmelin* to a 'third striker' like appellant leads to the conclusion that the third striker's 25-year-to-life term is not cruel and unusual under the Eighth Amendment.  Harmelin received a mandatory life without parole sentence for simply possessing a substantial amount of drugs.  In comparison, the third striker like appellant is sentenced to a term of 25 years to life, with the possibility of parole, for committing a felony offense after being convicted of at least 2 prior 'serious' or 'violent' felonies."  (*People v. Cooper*, *supra*, 43 Cal.App.4th at p. 823.)

11

12

13

[Petitioner's] sentence is not disproportionate to his recidivist crimes; therefore, the sentence does not constitute cruel and unusual punishment under the federal Constitution.

14

(LD 1 at 31-32.)

15

A criminal sentence that is not proportionate to the crime for which a defendant is

16

convicted may indeed violate the Eighth Amendment. In Rummel v. Estelle, 445 U.S. 263, 100

17

S.Ct. 1133 (1980), the Court upheld a life sentence imposed under a Texas recidivist statute for a

18

defendant convicted of obtaining $120.75 by false pretenses, an offense normally punishable by

19

imprisonment for two to ten years.  Rummel v. Estelle, 445 U.S. 263, 266, 100 S.Ct. 1133, 1135

20

(1980).  However, because he had two prior felony convictions (for fraudulent use of a credit

21

card and passing a forged check), and had served two prior prison terms, the prosecution chose to

22

proceed under the state's recidivist statute, which carried a life sentence.  Id. The Supreme Court

23

held that Rummel's sentence of life imprisonment *with* the possibility of parole did not violate

24

the Eighth Amendment.  Id. at 265-266, 100 S.Ct. at 1135. (emphasis added).  The Court noted

25

that Rummel had suffered two separate convictions and terms of imprisonment for each prior,

26

that he would be eligible for parole in twelve years, and that under the Texas recidivist statute,

27

prosecutors retained the discretion not to invoke the statute for "petty" offenders.  Id. at 278-281.

28

Three years later, the U.S. Supreme Court set forth the criteria for finding a sentence to be

cruel and unusual punishment under the federal Constitution and affirmed a decision of the

Eighth Circuit holding unconstitutional a sentence of life imprisonment without the possibility of

parole for a seven-time nonviolent felony recidivist. Solem v. Helm, 463 U.S. 277, 103 S.Ct.

3001 (1983).  Applying the proportionality criteria, the Court concluded that Solem's sentence

was grossly disproportionate to his crime of uttering a "no account" check for $100.00, even in

light of his prior six nonviolent felony convictions: three for third degree burglary, one for

obtaining money under false pretenses, one for grand larceny, and one for driving while

intoxicated. Id. at 279-281, 103 S.Ct. at 3004-5.  The Court emphasized that Solem's life

sentence was far more severe than the sentence it had considered in Rummel, because Rummel

was likely to be eligible for parole in twelve years, while Solem was given no possibility of

parole at all. Id.

In Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991), the defendant received a

mandatory sentence of life in prison *without* the possibility of parole for possession of more than

650 grams of cocaine, his first felony offense.  Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct.

2680 (1991) (emphasis added).  The U.S. Supreme Court upheld the sentence, with five justices

agreeing, for varying reasons, that the sentence did not violate the Eighth Amendment.  Although

the Court did not produce a majority opinion, seven justices favored some manner of

proportionality review.  Justice Kennedy, joined by Justices O'Connor and Souter, stated that a

noncapital sentence could violate the Eighth Amendment if it was "grossly disproportionate" to

the crime, but concluded that courts need not examine the second and third factors of

intrajurisdictional and interjurisdictional reviews discussed in Solem, unless "a threshold

comparison of the crime committed and the sentence imposed leads to an inference of gross

disproportionality." Id. at 1005.  The Ninth Circuit, adopting Justice Kennedy's concurring

opinion in Harmelin, now refers to the test articulated as "the rule of Harmelin." Andrade v.

Attorney General of the State of California, 270 F.3d 743, 756 (9th Cir. 2001).

The majority of the justices in the Harmelin court agreed that outside capital punishment,

deeming a sentence cruel and unusual punishment is "exceedingly rare" due to the lack of

objective guidelines for terms of imprisonment.  Harmelin, 501 U.S. 957, 964, 111 S.Ct. 2680

(1991).  The threshold for such an inference of disproportionality is high.  Id. at 1001, 111 S.Ct. at 2707 (Kennedy, J. concurring).  Generally, so long as the sentence imposed by the state court does not exceed statutory maximums, the sentence will not be considered cruel and unusual punishment under the Eighth Amendment.  United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990).

The Harmelin Court concluded that the defendant's sentence did not meet the threshold factor of "gross disproportionality."  Justice Kennedy stressed the serious nature of Harmelin's offense, stating that the offense "threatened to cause grave harm to society" unlike "the relatively minor, nonviolent crime at issue in Solem."  Harmelin v. Michigan, 501 U.S. 957, 1002, 111 S.Ct. 2680, 2705 (1991).  Justice Kennedy further noted that the "possession, use, and distribution of illegal drugs represent 'one of the greatest problems affecting the health and welfare of our population.'" and that the quantity of cocaine possessed by Harmelin had a potential yield of between 32,500, and 65,000 doses.  Id.

In Lockyer v.  Andrade, 538 U.S. 63 (2003), the Supreme Court discussed the current state of Eighth Amendment proportionality review and held that the only clearly established governing legal principle is that a "gross disproportionality" review applies to criminal sentences for a term of years.  Id. at 72.  Citing extensively to its past cases dealing with criminal sentencing and proportionality under the Eighth Amendment, the Court acknowledged that it has "not established a clear and consistent path for courts to follow."  Id.  The Supreme Court held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' frame work is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case."  Id.

In Ewing v.  California, 123 S. Ct.1179 (2003), the Supreme Court again reviewed the Supreme Court's Eighth Amendment jurisprudence, and chose to adopt Justice Kennedy's view [3] that:

[There are] four principles of proportionality review-- the primacy of the

_____

[3]As expressed in his concurring opinion in Harmelin v.  Michigan, 501 U.S. 957, 1001 (1991), *citing* Solem v.  Helm, 463 U.S. 277, 288 (1983).

1
2
3

> legislature; the variety of legitimate penological schemes; the nature of our federal
> system; and, the requirement that proportionality be guided by objective factors–
> that inform the final one: The Eighth Amendment does not require strict
> proportionality between the crime and the sentence.  Rather, it forbids only
> extreme sentences that are 'grossly disproportionate' to the crime.

4    Ewing, at 1186-1187.

5          In conducting a proportionality review of Ewing's sentence, the Court stated, "[i]n

6    weighing the gravity of Ewing's offense, we must place on the scales not only his current felony,

7    but also his long history of felony recidivism."  Id. at 1189-1190.  The Court noted that "any

8    other approach would fail to accord proper deference to the policy judgments that find expression

9    in the legislature's choice of sanctions."  Id. at 1190.  In imposing a Three Strikes sentence on a

10   recidivist criminal, the Court recognized the state's interest in dealing "in a harsher manner with

11   those who by repeated criminal acts have shown that they are simply incapable of conforming to

12   the norms of society as established by its criminal law."  Id., citing Rummel v. Estelle, 445 U.S.

13   263, 276 (1980).  Accordingly, proportionality review must take this interest into account.  Id.

14   The Court held that Ewing's sentence of 25 years to life was justified by the State's public-safety

15   interest in incapacitating and deterring recidivist felons, and amply supported by Ewing's long,

16   serious criminal record.  Id.

17         In this case, the state court correctly applied clearly established Supreme Court precedent,

18   and the state court's conclusion was objectively reasonable as Petitioner's enhanced sentence of

19   25 years-to-life was not grossly disproportionate to the offense of possession of

20   methamphetamine.

21         Petitioner contends that this case is analogous to the circumstances present in Ramirez v.

22   Castro, 365 F.3d 775 (9th Cir. 2004), in which the Ninth Circuit held that a sentence of 25 years

23   to life was grossly disproportionate to the triggering offense of felony petty theft where none of

24   the offenses involved violence or the use of weapons.  The Court does not agree.  Under the

25   Three Strikes law, the two prior convictions can be serious and/or violent.  Despite Petitioner's

26   insistence that his prior burglary convictions were nonviolent, a particular burglary may not

27   involve any violence or threats, but the very nature of residential burglary makes it a highly

28

dangerous crime.

> "Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation-the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence.  The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety; and thus the higher degree the burglary law is intended to prevent those situations which are most dangerous, most likely to cause personal injury."

People v. Lewis, 274 Cal.App.2d 912, 920 (1969), quoted with approval in People v. Gauze, 15 Cal.3d 709, 715 (1975).

Petitioner's claim that his current offense of possession of methamphetamine is less serious than his prior offenses is also without merit.  See e.g. Taylor v. Lewis, 460 F.3d 1093 (9th Cir. 2006) ("the gravity of his offense was not merely possessing one hit of crack cocaine. 'Rather [he] was convicted of [felony possession of a controlled substance] after previously having been convicted of at least two 'violent' or 'serious' felonies.'")  In assessing the gravity of Petitioner's current offense, the Court notes that the "triggering" offenses in Andrade and Ewing involved property crimes.  Because the possession offense in this case could have been charged as either a felony or misdemeanor, and the petty theft offense in Andrade resulted in a felony only if the defendant had a prior conviction, the Court finds Petitioner's possession offense to be similar in seriousness to the level of the property offenses involved in Ewing and Andrade, and unlike the defendant in Solem, Petitioner is eligible for parole.

Petitioner's criminal record includes an arrest for hit-and-run driving in 1989, which resulted in 35 days in jail.  That same year, Petitioner was arrested on four counts of residential burglary and one count of receiving stolen property.  Petitioner was sentenced to eight years in prison and was released on parole in June of 1994.  Within one month of his release he violated the conditions of his parole.  In February of 1995, less than one year later, Petitioner committed the instant offense and was found with an overdosed woman in a motel room.  Petitioner was high on methamphetamine and had numerous bindles of the substance on his person.  Another drug user was in the motel room and a loaded firearm was found in the waste basket by police. (CT 111.)

On October 13, 1995, Petitioner pled guilty and in exchange the court agreed to postpone sentencing for two years (with a status hearing within one year), and if no arrests occurred the felony would be reduced to a misdemeanor.  Between February and October of 1996, Petitioner was returned to custody, and admitted using methamphetamine, striking his wife and being involved in the manufacturing of methamphetamine.  (CT 113.)  In May of 1996, Petitioner was also arrested for misdemeanor driving on a suspended licence and spent time in jail, while on probation for the instant offense.

Contrary to Petitioner's claim, Petitioner is precisely the type of repeat offender for whom the Three Strikes law was created.  Petitioner has repeatedly violated parole and returned to custody, despite having served a prior prison term.  In imposing a Three Strikes sentence on a recidivist criminal, the Supreme Court recognized the state's interest in dealing "in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law."  Harmlein v. Michigan, 501 U.S. 957, 1001 (1991) (citing Rummel v. Estelle, 445 U.S. 263, 276 (1980).  In the words of the probation officer,

> This defendant is 31 years of age and was committed to state prison from Sacramento on four separate First Degree Burglary charges plus a Receiving Stolen Property charge in 1990.  The defendant was released on parole in June of 1994 and in January of 1995, parole was suspended back to July 29, 1994.  Therefore, the defendant had been only out of custody approximately one month when he was in violation of parole.
>
> He committed the instant crime in February of 1995 and upon his arrest was ordered to serve a one year parole violation and released on parole in February of 1996.  Between February of 1996 and October of 1996, the defendant violated terms of parole and was involved in striking his wife, admitted that he was continuing to use crank, and admitted to your officer that he was also involved in the making of crank.  The defendant admits that he would stay up for as long as 44 days at a time and went through a "meth coma" of five days.  The defendant feels that he needs a lot of help for his methamphetamine usage.
>
> The defendant's history shows a poor performance while on parole as well as picking up a misdemeanor charge of Driving on a Suspended License.  The defendant continues to use methamphetamine before and after the instant crime.  Your officer finds no justification to consider a grant of probation in the instant case.  Your officer finds no unusual circumstances pursuant to the defendant's prior felony convictions within the guidelines of PC 1203(e)(4) and he is statutorily ineligible for consideration for probation pursuant to Penal Code Section 667(c).  Since 1990, your officer has found nothing in the defendant's history to show any effort on his part to turn his life around.

(CT 113.)

For the foregoing reasons, the appellate court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court, nor an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §§ 2254(d)(1), (2), (e)(1).

<u>RECOMMENDATION</u>

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   December 2, 2011**                    **/s/ Barbara A. McAuliffe**
                                                         UNITED STATES MAGISTRATE JUDGE

25